Hal K. Gillespie (*pro hac vice* application pending)
James D. Sanford (*pro hac vice* application pending)
Tiffany C. Alvoid (*pro hac vice* application pending)
GILLESPIE, ROZEN & WATSKY P.C.
3402 Oak Grove Ave., Suite 200
Dallas, Texas 75204
Tel:     (214) 720-2009
Fax:    (214) 720-2291
E-mail:  hkg@grwlawfirm.com
           jsanford@grwlawfirm.com
           talvoid@grwlawfirm.com

Mary Dryovage, Cal. Bar No. 112551
LAW OFFICE OF MARY DRYOVAGE
600 Harrison St., Suite 120
San Francisco, CA 94107
Tel:     (415) 593-0095
Fax:    (415) 593-0096
E-mail:  mdryovage@igc.org

**E-filing**

**ORIGINAL**

**ATTORNEYS FOR PLAINTIFF**

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| KENT H. ROBERTS, | Case No. **CV 09 4303** |
| *Plaintiff*, | **ORIGINAL COMPLAINT** |
| v. | |
| McAFEE, INC., | (1)  Malicious prosecution |
| | (2)  Defamation |
| *Defendant*. | (3)  False light invasion of privacy |
| | Judge: _____ |

**DEMAND FOR JURY TRIAL**

## I.    INTRODUCTION AND BACKGROUND

1.      This is an action for malicious prosecution, defamation and defamation *per se*, and false light invasion of privacy stemming from Defendant McAfee, Inc.'s ("McAfee,"

"defendant," or "the company") malicious and tortious conduct toward Kent H. Roberts, its former Executive Vice President and General Counsel. In late spring 2006, the Securities and Exchange Commission ("SEC") began focusing attention on McAfee's stock-option award practices. The investigation examined whether McAfee backdated stock-option awards and violated federal law and/or its disclosure and accounting obligations.

2. Fearing individual and corporate liability, McAfee's then-CEO George Samenuk and members of its Board of Directors ("BOD") instituted a campaign of diversion, misrepresentation, and falsehood aimed at shifting the attention of federal authorities away from Samenuk's and McAfee's misdeeds. The BOD literally dubbed the campaign "Project Shield." Roberts became the scapegoat, while Samenuk, the BOD, and McAfee were to be shielded. Through Project Shield, McAfee succeeded in redirecting the SEC's and federal prosecutors' attention away from Samenuk and individual board members and onto Roberts.

3. On or about May 29, 2006, McAfee summarily terminated Roberts, claiming that the termination was "for cause" and alleging that he engaged in an "improper" episode in 2000 relating to stock option grants. The company's explanation was not based on actual investigation or careful deliberation but rather was based on a false assertion that Roberts had confessed. McAfee compounded its deliberate abuse of Roberts by broadcasting its allegations of "improper" conduct to the public. In summarily terminating Roberts and then publicizing false accusations of impropriety, McAfee destroyed Roberts' professional reputation and devastated his opportunities for future employment.

4. On or about February 27, 2007, based on deliberately misleading and incomplete information received from McAfee, the United States Attorney ("USAO") for the Northern District of California indicted Roberts on seven felony counts including, *inter alia*, mail and wire

fraud, making false statements to the SEC, and falsifying company books and records. Although innocent of wrongdoing and only incidentally involved with the stock option program, Roberts is the only McAfee officer indicted in connection with the company's stock-option awards practices. McAfee's deliberately misleading and incomplete communications to the DOJ and USAO directed the government's attention away from the BOD and Samenuk, who were responsible. McAfee's BOD—not Roberts—was responsible for allocating and approving stock-option grants to employees, as well as reviewing and approving the company's options-granting policies. As to the pertinent stock options, Roberts was not responsible for granting or approving stock options for the company, nor was he ever responsible for McAfee's financial accounting and reporting.

5. The day following Roberts' indictment, also based on skewed, false, and incomplete information received from McAfee, the SEC sued Roberts for, *inter alia*, fraud and altering company records. The SEC alleged that Roberts secretly accessed McAfee's internal computer system and altered the terms of one of his option grants in order to reap nearly $200,000 in illicit gains. It further alleged that Roberts, as the BOD Secretary and company General Counsel, falsified company records and filed false and misleading statements with the SEC. The SEC sought injunctive relief barring Roberts from serving as an officer of a public company, civil penalties and other relief, and disgorgement (with interest) of certain amounts allegedly gained by Roberts since 2000.

6. Before going to criminal trial in September 2008, the USAO dropped four of the seven counts against Roberts. It tried only the wire fraud, mail fraud, and altering company books and records counts relating to Roberts' Promotion Grant. After nearly three weeks of trial in the Northern District of California—San Francisco Division, a jury acquitted Roberts on the

1  remaining fraud charges on or about October 3, 2008. The USAO dropped the remaining

2  charge—Roberts' alleged alteration of company books and records—the next business day. On

3  or about March 20, 2009, after several more months of hard-fought litigation, which further

4  discredited the information provided by McAfee, the SEC voluntarily dismissed its proceedings

5  against Roberts and cleared him of all securities-law violations.

6

7      7.    Thus, by March 2009, Roberts' innocence was vindicated. Nonetheless,

8  McAfee—which instigated, encouraged, and facilitated Roberts' prosecution—continues to

9  publicize false and defamatory allegations of Roberts' supposed "improper" conduct relating to

10 stock options with full knowledge of their falsity. McAfee's malicious actions destroyed

11 Roberts' professional reputation and severely and irreparably damaged his career. Further,

12 McAfee's malicious conduct caused Roberts to endure severe economic injury and extreme

13 mental anguish and hardship. Plaintiff therefore complains and for causes of action alleges as

14

15 follows:

16

17                         **II.  PARTIES**

18     8.    Plaintiff Kent H. Roberts is an individual and a former employee of McAfee,

19 whom McAfee maliciously prosecuted and defamed. Roberts is a resident of Dallas, Dallas

20 County, Texas.

21

22     9.    Defendant McAfee, Inc. is a Delaware corporation with its principal executive

23 offices located at 3965 Freedom Circle, Santa Clara, California. McAfee, which prior to June

24 30, 2004 was known as Network Associates, Inc., is a worldwide supplier of computer security

25 solutions designed to prevent intrusions on networks and secure computer systems and other

26 digital devices from known and unknown threats and attacks. The company develops, markets,

27 distributes and supports computer security solutions for large enterprises, governments, small

28

- 4 -
ORIGINAL COMPLAINT & JURY DEMAND – C - _____

and medium-sized businesses, and individual consumers. It reported revenues in FY 2008 of about $1.6 billion and employs more than 5,500 individuals in the United States and abroad. McAfee may be served with process by serving its registered agent, CT Corporation System, 818 West Seventh Street, Los Angeles, California 90017. Additionally, McAfee may be served with process on its President and CEO, Dave DeWalt, 3965 Freedom Circle, Santa Clara, California 95054.

### III.    JURISDICTION AND VENUE

10.    The court has jurisdiction over this action because Plaintiff and McAfee are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Jurisdiction lies under 28 U.S.C. § 1332.

11.    Venue is proper in the City of San Francisco because a substantial part of the events, acts, omissions and actions complained of herein took place in San Francisco county, including, *inter alia*, Roberts' criminal trial, which occurred at the federal courthouse at 450 Golden Gate Avenue, San Francisco, California 94102.

### IV.    FACTUAL ALLEGATIONS

**A.    Roberts' employment with McAfee**

12.    Roberts joined McAfee, then Network Associates, Inc., as Director of Legal Affairs on May 1, 1998. McAfee promoted Roberts to Senior Director of Legal Affairs on or about January 1, 2000 and then to Vice President of Legal Affairs on or about February 13, 2000. He became General Counsel and Corporate Secretary in or about January 2001, before receiving the title of Executive Vice President on or about July 11, 2001. He remained an Executive Vice

President and the company's General Counsel and Corporate Secretary until his dismissal on May 29, 2006.

13.     Roberts is an attorney licensed to practice law in Texas and Missouri.  His legal career has spanned more than 25 years, including more than 12 years of experience in the software industry.  Roberts was a strong performer for McAfee and regularly received salary increases, merit bonuses, and stock options.  He was well-regarded both within McAfee and in the broader software industry prior to May 29, 2006.  Former CEO George Samenuk once described Roberts as a "champion" in his efforts on the company's behalf.  Another former board member views the McAfee General Counsel position as one of the most difficult jobs in the country, and believes that Roberts performed that role in a hard-working, conscientious, and careful way.  Beyond his work for McAfee, Roberts was also a board member of the Business Software Alliance ("BSA"), an industry group representing the interests of software companies on a wide range of business and policy issues.  In early 2006, he was Chairman of that organization's Board of Directors.  Roberts' termination in May 2006 forced him to end his association with the BSA.

**B.      McAfee delegated authority over stock-option grants to its CEO and that authority flowed downstream**

14.     Like many other public companies, McAfee had a practice of issuing stock options as a means of attracting and retaining employees and other executives.  A stock option gives the right to buy shares of stock at a set "strike" price (also called an "exercise price") and is meant to align the recipient's and the company's interests.  An option's value increases as the company's stock price rises above the option's "strike" price.  Among the reasons for which McAfee grants stock options are an employee's hiring ("new hire grant") and promotion ("promotion grant").

The BOD also generally approves each year a pool of options ("focal grant") to be distributed by management based on performance, achievement, or felt-need to retain or reward certain key employees.

15. McAfee awarded stock options under various shareholder-approved plans over the years. Concurrent with the adoption of the 1997 Stock Incentive Plan (the "97 Plan"), under which more than half the company's grants were issued including those to Roberts, McAfee's BOD delegated authority to the CEO to issue stock option grants of 15,000 shares or less. The BOD's delegation also provided that the number of shares covered by the delegated authority would automatically be adjusted in the event of certain future events, including stock splits.

16. McAfee's BOD approved a 3-for-2 stock split in 1998. In doing so, it increased the CEO's delegated authority to grant options by a factor of 1.5. Consequently, under the 97 Plan, McAfee's CEO was authorized to grant up to 22,500 shares. This delegation of authority was neither amended nor repealed prior to the end of 2000.

17. William Larson served as McAfee's CEO from approximately 1993 through January 2, 2001. By 2000, Larson had delegated his authority over stock option grants to certain department-head Vice Presidents. Then-CFO Prabhat Goyal and/or Terry Davis, the Senior Vice President and Controller, were the officers responsible for awarding options to Roberts and others in the Legal Department. Davis exercised delegated authority on numerous occasions in 2000 by setting the number of shares, the grant dates, and exercise prices for grants to various individuals, including Roberts.

18. In addition to his duties managing the Finance Department, starting in the fall of 1999, Davis oversaw the administration function for the company's overall stock option program, including the review and correction of administrative errors. Roberts, unlike Davis,

- 7 -
ORIGINAL COMPLAINT & JURY DEMAND – C - _____

never supervised McAfee's stock option program. In or about January 2000, Davis brought in Stock and Options Solutions, Inc. ("SOS") to make corrections to previous grants and records, and a few months later, SOS was given broader day-to-day responsibility for tracking, issuing, auditing, and correcting grants.

**C. Roberts is promoted in early 2000 and, after nearly five months in his new role, receives stock options; the options initially are issued incorrectly; Davis later exercises his authority to correct the award date**

19. In early 2000 Roberts received two promotions in quick succession. On or about January 1, 2000, then-CFO Prabhat Goyal promoted Roberts to Senior Director of Legal Affairs. A few weeks later, on or about February 13, 2000, Goyal again elevated Roberts, this time to Vice President of Legal Affairs. The personnel action form ("PAF") reflecting this promotion was issued on or about February 15, 2000. The PAF indicated that Roberts received no grant of stock options in connection with the promotion to Vice President. McAfee's stock closed at $29.65 on February 14, 2000.

20. McAfee subsequently decided to grant stock options in connection with Roberts' promotion to the Vice President position. On or about July 5, 2000, Goyal and Davis authorized a new PAF, indicating that Roberts received a grant for 20,000 shares with an exercise price "as of" February 14, 2000 (the "Promotion Grant"). The 20,000-shares award was within the CEO's and, by extension, Goyal's and Davis's delegated authority of 22,500 shares. Davis, Goyal, and the Vice President of Human Resources all signed the July 5 PAF authorizing that award. Roberts did not sign the July 5 PAF authorizing the award. McAfee's stock closed at $19.69 on July 5, 2000, making Roberts' options underwater from inception, in contravention of company practice.

21. On or about July 13, 2000, the BOD's Compensation Committee ratified the 20,000 grant to Roberts. The BOD met that day and approved a list of stock-option grants. Roberts' Promotion Grant was among the approved grants. McAfee's stock closed at $23.56 on the day of the board meeting. At that closing price, Roberts' Promotion Grant options were still underwater on the date of the board meeting.

22. Later in 2000, Davis initiated a conversation with Roberts regarding McAfee's recent share-price drop and the potential negative impact on employee morale generally as employee grants became underwater. During the conversation—unprompted by Roberts—Davis said that he could fix Roberts' Promotion Grant and assured Roberts both that he (Davis) had the authority to do so and that it was appropriate to do so. Davis, without input from Roberts, advised that the date for the Promotion Grant would be set as April 14, 2000. Davis's determination that April 14, 2000 was the proper date brought Roberts' grant in line with McAfee's general practice of dating grants within a few days after the first Compensation Committee meeting following promotion (*i.e.*, the April 13, 2000 Compensation Committee meeting). Roberts did not instigate, execute, or manipulate this change. Roberts relied on Davis's stated authority to make the correction. This correction was one of dozens of corrections that Davis, working with SOS, made in 2000 in furtherance of McAfee's ongoing effort to improve the company's stock option program.

23. In or about November 2000, Roberts, Davis, and an SOS consultant assisting McAfee with stock administration, corresponded concerning the Promotion Grant. This correspondence clearly reflects that Roberts was not directing Davis or anyone from SOS, but that he was following up based on previous representations made to him. On or about Wednesday, November 15, 2000, Roberts sent Davis an e-mail noting that he had not yet

received the "actual agreement on the 20000 VP grant in April 2000." Roberts apologized for bothering Davis but asked Davis to look into it. The following morning Davis instructed SOS to send Roberts the paperwork on the "VP grant in April 2000" and responded to Roberts' message advising that he had done so. An SOS consultant responded to both Davis and Roberts later on the morning of November 16, 2000 promising to "check into this" and to mail Roberts the paperwork that same day. Following the e-mail exchange of mid-November, Roberts and the SOS consultant communicated back and forth over the next two weeks concerning delivery of the paperwork. Roberts received the final version of the "20000 VP grant in April 2000" agreement on or after November 29, 2000.

24.     Roberts' Promotion Grant was entered into McAfee's stock option administration database, Transcentive, on November 29, 2000. The date of a grant's entry into Transcentive is its "Create Date," after which it cannot be revised. The Create Date for Roberts' Promotion Grant is November 29, 2000. Only certain individuals, such as SOS consultants administering McAfee's stock options, were authorized and able to access Transcentive. Roberts had no access to Transcentive and did not access Transcentive in November 2000 or at any time. On information and belief, an SOS consultant followed Davis's directive and entered the Promotion Grant into Transcentive on or about November 29, 2000 with a grant date of April 14, 2000 and a "strike" price of $19.75. Davis's correction of Roberts' promotion grant did not use the November 29, 2000 stock price of $14.06 that would have been more favorable to Roberts. Rather, the Davis correction used a stock price of $19.75 that was virtually the same as the stock price on July 5, 2000 ($19.69).

25.     The option program as it operated in 2000 was audited five times prior to 2006 by third parties who were aware that the program should receive special attention, including outside

auditors PricewaterhouseCoopers ("PWC") and Deloitte & Touche ("D&T"). In each case, the auditors affirmatively looked at the option program being administered by Terry Davis and SOS, including the grant to Roberts relating to his promotion to Vice President. In each case, the auditors concluded their review without raising concerns about the Promotion Grant's April 14 date or the change made by Davis to the date.

26.     As of November 29, 2000, Roberts had four outstanding options grants other than the Promotion Grant for a total of five grants. Three of the five grants were "underwater" at the time, meaning that their strike prices were above the stock's market price as of that date. Davis did not make any change to any of Roberts' other outstanding grants at the same time that he was correcting the Promotion Grant's exercise date from February 14, 2000 to April 14, 2000.

**D.     Samenuk arrives in January 2001 as the new CEO and immediately approves the largest focal grant in company history**

27.     McAfee closed 2000 by announcing the resignation of much of its senior leadership, including CEO Larson and CFO Goyal. On or about January 2, 2001, the company hired George Samenuk as President and CEO. Samenuk would become the Chairman of the Board in or about July 2001. Samenuk's first significant financial act after being named CEO was to propose a much larger than usual grant of stock options to company employees. He initially proposed a focal option pool of seven million shares.

28.     The BOD met on or about January 24, 2001. Samenuk presented his request for a 2001 focal grant of 7 million options along with a request to re-price all outstanding employee options. The BOD did not agree to the proposed mass re-pricing but it increased the focal pool from 7 million to 10.3 million shares with a January 2, 2001 grant date. At various points over the following two months, McAfee finalized the January 2001 focal option grants but kept the

January 2, 2001 award date.  McAfee's stock closed at $4.19 on January 2 and $7.91 on January 24.  This price difference of $3.72 per share (between the January 2, 2001 grant date and the January 24, 2001 BOD meeting date) built in over $38 million in value for the 10.3 million shares, an act by Samenuk and the BOD that was susceptible to SEC scrutiny.

**E.      McAfee's BOD approves Samenuk's 2002 grant; Roberts merely records the BOD meeting minutes**

29.     In early 2002, McAfee's BOD approved an option grant to Samenuk (the "Samenuk Merit Grant") of 420,000 shares.  The Compensation Committee met on or about January 15, 2002.  Samenuk and Roberts attended portions of that meeting, but both were absent during the discussion of Samenuk's compensation.  The BOD approved the grant of 420,000 shares to Samenuk but did not specify the award date during the meeting.  McAfee's shares closed at $27.19 on January 15, 2002.

30.     The following day Roberts received information from the Vice President of Human Resources that Samenuk had stated that the BOD dated his 420,000 Merit Grant options on January 16, 2002.  Later that day, Roberts received confirmation from Samenuk.  With that confirmation, Roberts sent an e-mail to Samenuk and the Vice President of Human of Resources relaying that Samenuk's Merit Grant options should be priced at the January 16 closing price of $25.43.

31.     Samenuk followed up on January 23, 2002, asking Roberts and the Human Resources Vice President for confirmation that the Merit Grant was dated January 16.  Samenuk asked in an e-mail: "On January 16th it appears that the stock price finished at 25.43…. is this the price that the new options will be set at?? Is that the low for those days after the Board

Meeting??" Roberts, based on his prior communications with Samenuk, replied that, "[t]he close on Jan 16 is the right price."

32. The Samenuk Merit Grant was entered into Transcentive on April 5, 2002 with a date of January 16, 2002. On information and belief, an internal options administrator in the HR organization created the database entry. Roberts had no access to Transcentive and did not access the database at any time.

33. Between January and April 2002, numerous officers, directors, and employees participated in discussions referencing the January 16, 2002 grant date for Samenuk's Merit Grant. None objected to setting that date as the grant date. The BOD was also fully aware and approved the January 16, 2002 date. In its April 9, 2002 meeting, the BOD approved the minutes from the January 15, 2002 Compensation Committee meeting, which unambiguously designated January 16, 2002 as the option date. All five directors present at the January 15, 2002 Compensation Committee meeting, as well as Samenuk, approved the minutes reflecting the January 16, 2002 grant date for Samenuk's Merit Grant. While the BOD made a change to another portion of the January 15, 2002 meeting minutes, the BOD left the January 16, 2002 grant date unchanged when it ratified the board minutes.

## F. A published report casts doubt on McAfee's stock option practices

34. In the latter half of 2005, the financial press began to question practices concerning stock-option backdating that were widespread and crossed industry lines. Options "backdating" refers broadly to the practice of dating an option grant based on hindsight to make an option's exercise price lower than if it were priced as of the date that its terms were actually fixed.

35. On or about May 16, 2006, the Center for Financial Research and Analysis ("CFRA") published a report entitled "Options Backdating—Which companies are at risk?".

The CFRA report reviewed stock-option grants at numerous companies in an array of industries. The CFRA highlighted five particular grant dates at McAfee, four of which were made during Samenuk's tenure as CEO including the January 2001 focal grant and Samenuk's Merit Grant. The CFRA report did not mention Roberts' Promotion Grant. That day McAfee initiated an internal review of its options granting process in response to the CFRA report. Another public report issued later that week highlighted several more McAfee stock option grant dates during Samenuk's tenure.

36.    On or about May 20, 2006, McAfee's Vice President of Human Resources provided Roberts a batch of e-mails relating to the allocation of the large (10.3 million shares) January 2001 focal grant. Roberts, in turn, provided these e-mails to the current CFO and to the company's lead internal auditor. This initial review led Roberts and the CFO to conclude that the options issue called for an independent investigation, particularly as it related to the January 2001 focal grant, as they saw a potential problem that might lead to a sizeable revision of the company's financial statements. Roberts began raising these concerns to the highest levels, including with the lead independent director, Robert Dutkowsky, and with the head of the Audit Committee. Such action by Roberts was consistent with his obligations as General Counsel and as a company officer. He discussed the e-mails provided by Human Resources, his concerns over the January 2001 focal grant, and the need for independent review with Samenuk and the BOD's outside counsel, Boris Feldman and others at WILSON SONSINI GOODRICH & ROSATI P.C. ("WILSON SONSINI").

37.    On or about Monday, May 22, 2006, the SEC submitted a document preservation request regarding stock-option information. The document request put the BOD and company

senior management on notice of the SEC's informal investigation into the company's stock-option practices.

38.     On or about Tuesday, May 23, 2006, Roberts and Boris Feldman discussed the options issue and Roberts' concerns, particularly his concerns relating to the large January 2001 focal grant. Although Roberts was not aware of any problem with his Promotion Grant, he also mentioned it to Boris Feldman and recommended that it be reviewed as part of the company's broader investigation. Roberts did not admit wrongdoing or express unease over Davis having corrected the Promotion Grant. As he explained to Boris Feldman, Davis had told Roberts that he (Davis) had authority for the change and that the change was appropriate, and Roberts relied on Davis's representations. Feldman asked for the opportunity to sleep on it, and the next morning called Roberts with advice on how to handle the discussion of the Promotion Grant with Samenuk and BOD members.

39.     On or about Wednesday, May 24, 2006, McAfee's management determined that an independent investigation of its stock-option grants was called for. Roberts, in New York for the annual shareholders meeting, met with Samenuk that evening at Samenuk's hotel to discuss the options issue. In their discussion, Roberts talked to Samenuk about the 2001 focal grant. Then, Roberts told Samenuk he wanted to also flag his 2000 Promotion Grant. He told Samenuk it had been changed by Terry Davis. Roberts explained how this had happened—that he and Davis were talking one day and Davis raised the issue that the stock prices had been going down and that he thought that was a significant employee retention kind of issue. Roberts told Samenuk he said to Davis that it was not an issue to him (Roberts), that he said, "All my options are underwater, but I'm still here, right?" Roberts told Samenuk that in the same conversation Davis had checked all Roberts' options, that Davis started focusing on the Promotion Grant and that he

said he would fix it or that he needed to fix it. Roberts explained to Samenuk that Davis had told him he was changing the date to April 14, 2000, and that he (Roberts) had asked Davis if that was appropriate and if he had authority to do that. Roberts told Samenuk that Davis emphatically told him "yes" to both questions—that he had the authority and that it was appropriate. Roberts told Samenuk that he relied on Davis and that he was sorry that he did not have all of the details concerning the Promotion Grant. Roberts also reminded Samenuk that the options in 2000 had been audited and reviewed several times. Roberts suggested to Samenuk nevertheless that his promotion grant be reviewed as part of the independent investigation.

40. After Roberts talked to Samenuk about options issues, Samenuk made no response to Roberts' expressed concern about the 2001 focal grant. Instead, from that moment, Samenuk began by his words and acts to focus attention away from the numerous stock option actions that he and the Board had taken during his tenure—which were then being widely questioned, and which might lead to civil and criminal exposure for Samenuk and the BOD—and to shift the focus onto Roberts. Acting upset, Samenuk told Roberts that that he was worried about the BOD's reaction and, without explaining how or why, Samenuk told Roberts that Roberts was going to lose his law license. Roberts told Samenuk that he had done nothing wrong and that Samenuk could reassure the board. Roberts reminded Samenuk that he (Roberts) had the highest ethics. Samenuk then directed Roberts to draft a list of actions that the BOD might take if, after due investigation, the BOD concluded that there was a problem with the change to the April 14, 2000 date for Roberts' promotion grant. Roberts drafted the list as instructed later that evening and gave it to Samenuk the following morning. Samenuk did not comment on the list of possible actions or discuss it with Roberts.

41.   On information and belief, Samenuk called lead independent director and former Compensation Committee chairman Robert Dutkowsky the following morning and deliberately and maliciously lied about what Roberts told him the night before. Samenuk falsely reported Roberts' statements concerning the Promotion Grant as a confession of wrongdoing and falsely claimed that Roberts admitted to accessing McAfee's options system along with Davis and changing the date on the Promotion Grant. Samenuk and Dutkowsky, prior to any investigation, discussed firing Roberts.

42.   Roberts met with Dutkowsky and Samenuk over breakfast on May 25, 2006 to discuss the growing stock-options issue and upcoming investigation. As he had the night before with Samenuk, Roberts explained the circumstances leading to Davis's change of the date of his Promotion Grant. Roberts suggested that his 2000 Promotion Grant be reviewed along with the much larger, more concerning grants. Roberts did not express guilt over Davis having corrected the grant date. Dutkowsky later falsely and maliciously claimed to investigators that Roberts admitted conspiring with Davis to change the option and feeling guilty about it over the next six years, causing Roberts not to exercise the option. Dutkowsky also maliciously omitted from his account of this conversation to investigators statements that Roberts made about Davis's authority and the appropriateness of the action. Dutkowsky held to most of these false statements until cross-examined at Roberts' criminal trial.

43.   Later in the morning of May 25, 2006, Samenuk and Dutkowsky met with Compensation Committee chairman and fellow-board-member Denis O'Leary. Samenuk and Dutkowsky falsely reported to O'Leary that Roberts had come forward to confess that he and Davis improperly re-priced Roberts' option for his benefit, reaping a $150,000 to $200,000 windfall, and later failed to disclose it.

44. Roberts also met with O'Leary that day. Roberts explained the issues surrounding the 2001 focal grant and recommended additional review of that large grant. Contrary to O'Leary's later attempt to downplay the degree of concern Roberts expressed regarding the large grant (10.3 million shares), Roberts did not state or imply that he felt that "it was probably okay...." To the contrary, and consistent with his obligations under securities law, Roberts raised the issue with a sitting board member (and head of the Compensation Committee) because the 2001 focal grant potentially could have required a significant restatement of the company's financial statements and was therefore of great concern to him.

45. Roberts also explained to O'Leary the circumstances of his 2000 Promotion Grant. Roberts described how Davis had unilaterally changed that particular grant to an April 14, 2000 date. Roberts explained that he had asked Davis "[A]re you sure this is okay?", referring to the changed grant date. O'Leary's notes from the conversation reflect his conclusion that, "[b]ased on [Davis's] answer [and] Kent's respect for [Davis], [Roberts] went along." Without the benefit of any investigation and despite Robert's explanation, O'Leary's immediate response, as though already scripted, was to lay blame at Roberts' feet. O'Leary responded that Roberts needed to come to grips with his role in the change to the Promotion Grant and not push the blame off on Davis. Roberts answered that he believed it was appropriate, that Davis was the actor behind the option change, and that option matters in 2000 had been reviewed several times.

46. Samenuk, Dutkowsky, and O'Leary spent much of the afternoon of Thursday, May 25, spreading to the other board members Samenuk's, Dutkowsky's, and O'Leary's false account of Roberts' supposed confession. The story Samenuk, Dutkowsky, and O'Leary conveyed had by then evolved into Roberts changing his own stock option, either by himself or by directing Davis to do it.

47.   Following his conversation with O'Leary on the morning of May 25, Samenuk directed Roberts to turn over his laptop to Samenuk and not take part further in the shareholders meeting.   Roberts complied with these directives.   He was treated even more harshly upon returning from New York. Shortly after his meetings with directors in New York, Roberts was locked out of his office and his employees were instructed not to speak with him on threat of termination.

48.   Samenuk, Dutkowsky, and O'Leary continued to twist Roberts' comments into a confession of wrongdoing.   On or about May 26, 2006, Samenuk talked to the head of McAfee's internal audit department.   Samenuk claimed that Roberts had voluntarily disclosed to him an inappropriate stock option grant made in 2000 in collusion with Davis.

49.   After Samenuk, Dutkowsky and O'Leary swiftly (pre-investigation) blamed Roberts for the Promotion Grant change, Roberts retained counsel to represent him in the investigation.   With the news of the SEC inquiry, McAfee's BOD had brought in Robert Gooding of HOWREY LLP ("HOWREY") to assist the BOD in carrying out the internal review. A lawyer for Roberts contacted Gooding on Roberts' behalf on or about Saturday, May 27, 2006 to discuss the possibility of making Roberts available for questioning after Roberts' counsel had time to digest the issues.   Gooding responded that the BOD might fire Roberts in the meantime. Roberts' lawyer encouraged Gooding and McAfee to slow down and allow time to investigate the facts before rushing to judgment.

**G.    McAfee summarily terminates Roberts' employment, then broadcasts allegations that Roberts committed malfeasance relating to stock options**

50.    On or about the evening of Monday, May 29, 2006, the full BOD met with Boris Feldman and others from WILSON SONSINI, and Gooding to consider courses of action. When the BOD addressed Roberts, Gooding outlined supposed "improprieties occur[ing] in connection with a stock option grant to Mr. Roberts." Boris Feldman presented three options: (1) allow Roberts to resign; (2) terminate Roberts for cause; and (3) suspend Roberts without pay while the investigation proceeded. Ignoring eight years of exemplary service by Roberts and inflamed by the falsehoods spread by Samenuk, Dutkowsky, and O'Leary, the BOD was unwilling to consider the third option. Based on lies by Samenuk, Dutkowsky, and O'Leary about what Roberts had said, Gooding recommended that the BOD opt for termination or resignation and advised that the BOD take "decisive action." Gooding, acting as an agent of McAfee, advised that any leniency shown to Roberts would increase the SEC's scrutiny of the company and its board.

51.    With the Special Committee's investigation underway, the BOD had the option of waiting until the conclusion of the investigation to determine whether Roberts had committed some wrongdoing. Instead, the BOD acted in haste and without due deliberation. It acted without reviewing any of the documents or policies from 2000 and before speaking with Roberts or anyone present or in authority in 2000. On or about May 29, 2006—only four days after Roberts approached Samenuk and individual board members—the BOD fired Roberts, asserting that the termination was "for cause" based on supposed "admissions already made to three directors" that he improperly orchestrated the backdating of his 2000 Promotion Grant.

52.    After the BOD fired Roberts, McAfee vigorously and publicly broadcast the dismissal. On or about Tuesday, May 30, 2006, McAfee issued a press release with the heading: "McAfee, Inc. Announces Departure of General Counsel".    The release, posted on the company's website, asserted as fact that Robert had committed malfeasance:

> McAfee, Inc. (NYSE: MFE"), today announced that its Board of Directors has terminated the employment of its General Counsel, Kent Roberts.  The Company had previously disclosed that it is reviewing prior practices in connection with grants of employee stock options.

> In connection with that review, the Company became aware of one episode involving the General Counsel in 2000 that was improper.  As a result, the Board has terminated his employment.  The Audit Committee is continuing to the review of other option granting practices and has retained independent counsel to assist it in that effort.  The Company has had communications on the subject of option grants with staff of both the Securities & Exchange Commission and the Justice Department....

The *Wall Street Journal*, the *New York Times*, and the Associated Press among others quoted the McAfee press release the following day in articles reporting on Roberts' termination.  Despite the fact that Roberts was fully cleared of wrongdoing as of March 2009, McAfee continued to publish the May 30, 2006 press release on McAfee's website for public review through and including September 15, 2009.

53.    At some point that week, the BOD established a Special Committee to investigate the company's stock-option practices.  Board member Robert Bucknam chaired the committee and was eventually joined by board members Dale Fuller and Charles Robel.  Gooding and HOWREY were to represent the Special Committee and conduct the investigation.  Along with forensic accounting firm FTI Consulting, HOWREY was to independently investigate questionable stock-option grants since the mid-1990s.  Gooding and HOWREY previously worked for the BOD from 2003 to 2004 in relation to an earlier SEC inquiry.

54.   On or about May 30, 2006, Boris Feldman contacted the SEC and spoke to investigators on behalf of the BOD.   Boris Feldman provided information to the SEC investigators that was inconsistent with the lies told by Samenuk, Dutkowsky and O'Leary that Roberts had confessed to wrongdoing.   Boris Feldman informed an Assistant Director of Enforcement working on the McAfee matter and the branch chief in the Enforcement Division working on the McAfee matter about Roberts' termination and then related that:

> Kent Roberts told CEO George Samenuk about how 20,000 of Roberts's options were backdated by former controller Terry Davis in 2000, and that Roberts had asked Davis if he had the authority to do that, and whether it was allowable, and that Davis told Roberts at the time that he had that authority, and it was okay to do it, and Roberts apparently relied on those statements.

Boris Feldman also confirmed at this time to the SEC that McAfee had received the SEC's document preservation letter and that the company was taking steps to comply with the request. Boris Feldman's account to the SEC mentioned nothing about Roberts admitting any wrongdoing or "agonizing" about the 2000 Promotion Grant change.

**H.   McAfee institutes "Project Shield" and begins to feed federal authorities slanted, incomplete, and false information about Roberts and his involvement in past option grants**

55.   On or about June 7, 2007, McAfee received an SEC subpoena seeking options-related documents.   The subpoena covered all e-mail relating to Roberts' 2000 Promotion Grant. The SEC subpoena put McAfee on notice that the government investigation had become official. McAfee was now formally under investigation for potential securities violations.

56.   On information and belief, the SEC's investigation into McAfee's options practices aggravated fears among board members of government action against the BOD. Several sitting board members were members of the Compensation Committee, the committee

charged by the BOD with administering and supervising the granting of options, during the time when several of the grants under scrutiny were authorized (including O'Leary and Dutkowsky).

57. In response to the government's investigation, the BOD engaged in a deliberate effort to divert attention onto Roberts in order to protect more senior company officers and directors whose conduct with respect to stock options was extensive and potentially unlawful. On information and belief, one or more board members believed that discrediting Roberts would enable the BOD to more easily shift blame away from current board members. The company and the BOD literally called the campaign to scapegoat Roberts and protect Samenuk and the board "Project Shield."

58. The BOD deliberately structured Project Shield in such a way as to insulate sitting board members, including Samenuk, and to filter information in such a way as to cast blame onto Roberts. On or about June 10, 2006, the Special Committee held its first meeting. Gooding and fellow HOWREY attorney Roman Darmer provided a detailed description of the scope and methodology of the investigation. Soon thereafter the Special Committee instituted a protocol to provide special treatment in the investigation for senior management and directors, including Samenuk. The special protocol, which worked to shield senior managers and directors, consisted of, *inter alia*, (1) advance discussion with senior managers and directors of the investigative process, (2) provision of relevant documents to senior managers and directors prior to their being interviewed, (3) and attendance by a Special Committee member at the senior managers' and directors' interviews. Further, the Special Committee permitted directors to produce documents on a voluntary basis and took no steps to ensure that they preserved pertinent documents. The Special Committee deliberately failed to see to it that directors' hard-drives were imaged, which likely resulted in pertinent documents being deleted either directly or by auto-delete software.

- 23 -
ORIGINAL COMPLAINT & JURY DEMAND – C - _____

When WSGR and HOWREY later determined that directors' e-mail had been deleted, they took no action against the directors and they failed to report the violation of the SEC's freeze order.

59. McAfee used "Project Shield" to steer the government investigation away from Samenuk and the BOD and toward Roberts by false or misleading information. On or about June 13, 2006, Gooding and Darmer communicated with the DOJ and SEC on McAfee's behalf. Gooding summarized for the government investigators the events leading to Roberts' termination. Gooding falsely recounted the May 23, 2006 conversation between Roberts and Boris Feldman by omitting Roberts' critical statements that Davis had confirmed to Roberts that he had authority, that the action was appropriate, and by adding to Roberts' statements the false, self-incriminating remark that Roberts had "agonized" over the changed options date and therefore never exercised his options. Before ending the call, Gooding also misrepresented HOWREY's ties to McAfee. Gooding, acting as an agent for McAfee, claimed that his firm had "no prior attachment to McAfee or its officers." On information and belief, Gooding's failure to disclose HOWREY's true history with McAfee's independent directors was an attempt to mislead the SEC into thinking that Gooding was in charge of a truly independent and objective investigation in order to (a) enhance the investigation's credibility in the eyes of federal investigators and (b) further the improper objectives of Project Shield.

60. An Assistant Director of Enforcement for the SEC almost hit upon the critical issue about the Roberts Promotional Grant in the June 13, 2006 meeting. He focused on the question of delegated authority, asking: "Who in management was approving Focal grants [and] new hire grants? Was there some kind of grant authority? Did the Comp[ensation] Com[mittee] later ratify [the change]? What was the process?" The Assistant Director did not receive substantive answers in the June 13, 2006 meeting. During the ensuing 27 months, through the

strategic withholding of key information and the deliberate disclosure of misinformation, McAfee, through Project Shield, succeeded in obscuring the government's understanding of the answers to those questions. Project Shield led directly to the government's prosecution of Roberts and its prosecution of Roberts with an inaccurate understanding of the authority delegated to Davis to carry out the change to the Promotion Grant.

61.    In a June 21, 2009 BOD meeting, Gooding raised the 2001 focal grant as an example of the "kinds of prob[lems]" that the investigation was finding. Gooding reported the investigation's preliminary view that there was "a signif[icant] potential" of the 2001 focal grant impacting the financial statement anywhere from $17.1 million to $28.8 million. Despite this early attention paid to the large 2001 focal grant (10.3 million shares), McAfee, in its later dealings with SEC and DOJ investigators, worked to minimize early concerns about grants other than Roberts' Promotion Grant. Through Project Shield, McAfee was able to prioritize for federal investigators Roberts' relatively small (20,000 share) Promotion Grant ahead of concerns over the vastly larger 2001 focal grant (10.3 million shares) and its potential accounting impact that was orders of magnitude greater. Through Project Shield, McAfee succeeded in shielding Samenuk from scrutiny. Samenuk, unlike Roberts, was heavily involved with the process that resulted in the dating of the 10.3 million shares in the 2001 focal pool.

62.    A goal of Project Shield was to ensure that directors of the company would not face questioning concerning their own involvement in options backdating. McAfee made Samenuk, Dutkowsky, and O'Leary available for deposition by the SEC on or about June 27, 2007. Prior to the depositions, WSGR, on McAfee's behalf, negotiated the scope of the depositions down to the narrow question of Roberts' 2000 Promotion Grant. WSGR, on McAfee's behalf (and as defendant's agent), ensured that Samenuk, Dutkowsky, and O'Leary

would not have to testify about any of the questionable option grants in which they might be implicated.

63.    The SEC deposed Samenuk, O'Leary, and Dutkowsky on or about June 27, 2007. The Special Committee's investigation by this point had uncovered ample evidence of issues of concern with the 2001 focal grant, as Roberts had advised prior to termination, and with other specific instances of intentional backdating by Samenuk. The SEC did not probe Samunek or the directors about these grants; instead, as negotiated, the questioning focused on Roberts' Promotion Grant and his supposed admissions to the three directors. Samenuk, Dutkowksy, and O'Leary each provided false accounts of their discussions with Roberts in May 2006. Samenuk faced no questions about his role in issuing the 2001 focal grant with backdated grant dates or in backdating other specific grants. On information and belief, the purpose and effect of responding only to questions about Roberts' Promotion Grant and the further effect of the directors' false testimony skewed the evidence against Roberts and diverted federal investigators' attention away from the backdating issues tied to the 2001 focal grant and other specific grants.

64.    Over the coming months, McAfee, through the Special Committee and/or counsel, was in near-weekly contact with investigators from the SEC and DOJ. Throughout, McAfee employed delay, misinformation, and selective disclosure of information to slant the evidence away from the issues surrounding the January 2001 focal grant that Roberts and others raised initially in May 2006 and against Roberts, and to depict Roberts to federal investigators as the individual behind all wrongdoing.

**I.     McAfee falsely represents that it had produced all documents pertinent to Roberts' Promotion Grant**

65.     Gooding and Darmer, on McAfee's behalf, met with the SEC and DOJ again on or about August 11, 2006.  Among other items, they updated investigators on the status of the company's document review and accounting work plan occurring as part of the Special Committee's investigation.  The Assistant Director of Enforcement who had honed in on the question of delegated authority back in June 2006 asked whether the company had provided the SEC all e-mails and documents regarding Roberts' Promotion Grant.  Darmer, on McAfee's behalf (and as defendant's agent), answered: "By and large, yes."  He then assured the SEC and DOJ that the investigation had not uncovered any e-mail correspondence between Roberts and others regarding his Promotion Grant.

**J.     McAfee publicizes the investigation targeting Roberts; Project Shield progresses, as McAfee continues to steer authorities toward Roberts**

66.     On or about August 15, 2006, following on the SEC's subpoena issued in June, the DOJ subpoenaed McAfee records relating to Roberts, his firing, and the Special Committee's investigation.  Like the SEC subpoena, the DOJ subpoena covered, *inter alia*, correspondence between Roberts, Davis, and others in 2000 concerning Roberts' Promotion Grant.

67.     As early as late July 2006, McAfee advised the public that its financial statements were unreliable.  In a Current Report ("form 8-K") filed with the SEC on or about July 27, 2006, the company indicated that it would be restating its previous financial statements due to issues with its stock options program.  The July 27, 2006 form 8-K was purposefully vague and did not identify for investors internal conclusions about the 2001 focal grant that contributed significantly to the decision to restate the financial statements.  McAfee's failure to disclose

information concerning the 2001 focal grant within the possession of the Special Committee had the effect of diverting scrutiny from Samenuk and the BOD for several more months. The July 27, 2006 form 8-K's deficiencies eventually required McAfee to file an amendment, which it did on or about August 16, 2006.

68.     Two days after amending the July 27, 2006 form 8-K, the company voluntarily filed a form 8-K disclosing that:

> McAfee, Inc. (the "Company") ha[d] received a grand jury subpoena from the U.S. Attorney's office for the Northern District of California relating to the company's previously disclosed termination of the employment of Kent Roberts, the company's former general counsel, his options-related activities, and the Company's previously announced investigation.

On information and belief, McAfee filed the form 8-K on August 18, 2006 to shift the public's focus from the company's upcoming restatement back to Roberts. The gambit succeeded: the *Wall Street Journal* reported on August 19, 2006 that McAfee had received a grand-jury subpoena regarding its firing of Roberts, "his activities related to stock options and the company's internal probe of option grants." The article was silent as to the company's amended 8-K two days earlier of a substantial upcoming restatement to its certified financial statements for a several-year period.

69.     On or about October 10, 2006, Gooding presented the investigative findings to the entire BOD. McAfee issued a press release on October 11, 2006 announcing (1) Samenuk's retirement, (2) the naming of board-member Charles J. Robel as board Chairman, and (3) the termination of McAfee's President with no reason specified. The announcement tied the personnel changes to the company's investigation into McAfee's historical stock options granting practices and related accounting which, the company announced, would require restatement of the company's financials by anywhere from $100 to $150 million. The release

quoted Samenuk as regretting that "some of the stock option problems identified by the Special Committee occurred on [his] watch." Samenuk's statement, which the company republished in its press release, deliberately obscured strong evidence of Samunek's personal direction of stock option backdating and made no reference whatsoever to the 2001 focal grant or other actions directed by Samenuk.

70. During the evening of October 10, 2006, O'Leary with the Board's authority negotiated a severance agreement with Samenuk. The agreement paid Samenuk more than $4.6 million and left him in a position to sue to recover the value of expired stock options. The parties reduced the agreement to writing and the Board approved the agreement on the evening of October 10, 2006. Although the deal was fully negotiated and ratified by the BOD the night before, McAfee's October 11, 2006 press release and related form 8-K filing omit any mention of the Samenuk severance agreement. McAfee delayed notifying federal authorities until February 2007—months after presenting the results of the Special Committee investigation to federal investigators.

71. On or about November 2, 2006, Gooding, on behalf of (and as agent of) McAfee, reported his investigation's findings to the SEC. The presentation inordinately focused on Roberts' Promotion Grant and deliberately minimized the serious issues presented by the 2001 focal grant (10.3 million shares) and the individual option grants under review. Gooding's report deliberately and misleadingly mischaracterized Roberts' role—and de-emphasized Samenuk's, Dutkowsky's, and other Board members' roles—in the individual grants. Despite the slanted presentation, the lead SEC investigator briefly saw past the shield and noted that, "all roads lead to Mr. Samenuk." On information and belief, McAfee's misrepresentations and selective disclosure of information overcame the SEC investigator's insight that Samenuk was deeply

involved in the options backdating issues at McAfee, ensuring that Roberts remained the government's sole target. Although the SEC asked for information relating to Samenuk's departure, McAfee represented falsely that it was meeting with Samenuk's lawyers to negotiate severance. McAfee's representatives failed to disclose that Samenuk's severance deal had been concluded nearly a month earlier.

72.     The company's dealings with the DOJ and SEC leading up to criminal charges against Roberts and the SEC's civil suit were deliberately tainted with deception, misinformation, and withheld information:

a.     McAfee identified for the DOJ and SEC witnesses to be questioned and previewed the testimony that witnesses would give. This allowed McAfee to filter information provided to investigators.

b.     On information and belief, the company knew through its investigation that by 2000 the BOD had delegated authority to the CEO to grant 22,500 shares. Yet the November 2, 2006 presentation to the SEC specifically pegged the delegated authority at 15,000 shares or less. McAfee never informed the SEC or DOJ that the authority to issue 22,500 shares had been delegated from the CEO to Vice Presidents such as Goyal and Davis. Consequently, the DOJ and SEC had inaccurate pictures of the facts prior to bringing legal action.

c.     On information and belief, the company knew through its investigation that Davis on numerous occasions had exercised the authority delegated to him to grant and correct stock options without BOD or Compensation Committee approval. These facts showed that his actions regarding Roberts' Promotion Grant did not violate but were consistent with company practices and policies. Davis's actions were reflected in company records that were available to the BOD and Special Committee in 2006 and afterwards. Moreover, Davis's actions concerning stock options had been audited numerous times since 2001 and, with few exceptions, had not been questioned by auditors. McAfee withheld this

information from the November 2, 2006 presentation and never shared it with the DOJ or SEC.

     d.    McAfee knew in 2006 and afterwards that Roberts' Promotion Grant was underwater at the time it was granted in July 2000. It also knew that Roberts received no stock options when initially promoted to Vice President in February 2000. Company records available to the BOD and Special Committee in 2006 and afterwards reflect each of these facts, yet McAfee never disclosed them to the DOJ or SEC. When McAfee at last produced the February 15, 2000 PAF showing no options awarded, it buried the PAF within a large mass of other documents and failed to mention it in the November 2, 2006 SEC presentation.

     e.    McAfee knew in 2006 and afterwards that Roberts held grants other than the Promotion Grant in 2000. It knew that several of Roberts' other grants were underwater at the time that Davis changed the Promotion Grant's award date. It also knew that Davis did not alter these other underwater grants. Yet McAfee did not disclose these facts to the DOJ or SEC.

     f.    McAfee knew in 2006 and afterwards that both the Special Committee and its Finance Department had concluded that February 14, 2000 was the incorrect date for Roberts' Promotion Grant. It knew this fact yet did not disclose it to the DOJ or SEC.

     g.    McAfee knew through its investigation, or reasonably should have known, that Davis instructed SOS by e-mail to change the date of the Promotion Grant in or prior to November 2000. Company records contained these e-mails in multiple locations within the company. McAfee failed to produce them to the government until the evening of the first day of Roberts' criminal trial.

     h.    McAfee provided to the government certain e-mail relating to the Samenuk Merit Grant out of context and with misleading explanations, while BOD members were deleting their own email in violation of the SEC freeze order. McAfee sponsored to the government false testimony about the BOD members' and Samenuk's awareness of the date of the Samenuk Merit Grant, about their ratification of the minutes and about the date on the Merit Grant violating a non-existent board policy.

i.      McAfee knew through its investigation that the Compensation Committee had ratified a grant in 2001 to a Samenuk associate brought in as a Division President, one of the individual grants under review.   Yet when it produced documents from Roberts' notebook to the DOJ and SEC via outside counsel (HOWREY, acting as defendant's agent) it intentionally withheld a key page, producing both the pages before and after.   The withheld page contained a note of a conversation Samenuk had with Roberts to the effect that the "Comp Comte approves," indicating board approval of the 2001 grant to the Division President.

73.     Instead of disclosing numerous facts tending to exonerate Roberts, McAfee actively worked to shield Samenuk and its directors by encouraging the government to pursue Roberts. The November 2, 2006 presentation to the SEC mischaracterized Roberts' involvement in stock-options decision-making and understated Samenuk's and individual board members' central roles. McAfee also failed to disclose the severance deal worked out between Samenuk and O'Leary on October 10, 2006, so that its bias toward Samenuk would not be revealed. After four months of stonewalling, McAfee at last disclosed on or about February 7, 2007 that it had agreed to pay Samenuk more than $4.6 million as part of a separation agreement that included a one-way release—such that McAfee retained the right to sue Samenuk—and a reaffirmation of Samenuk's confidentiality obligations. The undisclosed agreement also contained a carve-out permitting Samenuk to sue the company later for the value of his lapsed stock options.

**K.      Roberts is indicted on felony criminal charges; the SEC sues Roberts based on information obtained from McAfee**

74.     Based on inaccurate and incomplete information from McAfee, the United States Attorney for the Northern District of California indicted Roberts on February 27, 2007.   The indictment contained seven felony counts relating to Roberts' 2000 Promotion Grant and the

2002 Samenuk Merit Grant.    The seven felony counts included charges of mail fraud, wire fraud, making materially false and misleading statements in SEC filings, and falsifying company records and books.  If convicted, Roberts faced up to 140 years in prison and millions of dollars in fines.  The indictment was widely publicized with stories running on and after February 28, 2007 in the *Wall Street Journal*, the *New York Times*, *USA Today*, the *San Francisco Chronicle*, and several other large, national newspapers.  The case got even wider attention in the specialty legal press, including the *Recorder*, the *Daily Record*, *American Lawyer*, and *Corporate Counsel*, which consistently reported over the next 18 months on the false allegations against Roberts.  News of the indictment publicly humiliated Roberts and severely and irreparably damaged his professional reputation and any remaining chance of obtaining comparable employment.  Due to McAfee's malicious drive to scapegoat him, Roberts was subjected to being mug-shot and fingerprinted twice; he was forced to surrender his passport and was restricted in his travel outside Dallas County, Texas; he was barred from holding certain types of jobs; and for 18 months, he was subjected to unannounced home visits by Federal officers.

75.    On the day after the criminal indictment, the SEC sued Roberts for injunctive and other relief. The SEC's suit, like the criminal case, was based on inaccurate and incomplete information McAfee fed to the SEC and focused on Roberts' Promotion Grant and the 2002 Samenuk Merit Grant, as well as a 2001 new hire grant to a McAfee Division President.  The SEC, based on information from McAfee, accused Roberts of "engaging in a fraudulent scheme to enrich himself and others by secretly changing the dates on which stock option awards had been granted" in order to fraudulently generate "in the money" option grants.  Ironically, Roberts did not "enrich" himself a single penny in the alleged "fraudulent scheme."

**L.     McAfee's auditors and internal finance team find Gooding's work deficient; McAfee ultimately restates its financial statements in 2007, employing fraudulent accounting to generate a compensation charge for Roberts' 2000 options**

76.     In February 2007, McAfee's external auditors, PWC, raised concerns about HOWREY's investigative work product.   In March, McAfee Finance reported to the Audit Committee that external auditors had halted work on the restatement based on these concerns.  In response, McAfee reviewed the Special Committee investigation report internally before performing any needed remedial work.  McAfee's Finance department and auditors reviewed the questioned option grants.  This subsequent review by the company's internal Finance team and external auditors raised doubts about the Gooding report's work-product and conclusions, finding specifically that:

    a.    the CEO had delegated authority to issue 22,500 shares as of 2000;

    b.    given the delegated authority, BOD action was not required on grants of less than 22,500;

    c.    the CEO had delegated authority downstream to certain Vice Presidents, Davis included, as of 2000; and

    d.    the February 14, 2000 date was the incorrect measurement date for Roberts' Promotion Grant.

Interim CEO and Special Committee member Dale Fuller reported to the BOD that McAfee's review gave the quality of HOWREY's work "a marginal passing score."  Fuller later reported to McAfee's incoming CEO that "Howrey really screwed up....", referencing the investigation. Despite these findings by its own auditors, neither McAfee nor outside counsel notified the SEC or federal prosecutors of these facts before the start of Roberts' criminal trial.  McAfee failed to

share with federal authorities the deep reservations held by both internal Finance and external auditors about the Gooding report.

77. On or about December 21, 2007, McAfee filed a restatement affecting some 53 million option shares. All told, the company adjusted its financial statements downward by $137 million. McAfee took a $13 million charge relating to the 2001 focal grant (10.3 million stock options)—the largest single restated item arising out of Samenuk's tenure. By comparison, the company included a non-cash charge of only approximately $76,000 relating to Roberts' Promotion Grant. This charge, however, was a fraud by the company on the government and on the company's investors in furtherance of Project Shield. Proper accounting methodology as to Roberts' Promotion Grant would have produced no accounting charge. McAfee utilized an improper methodology to reach its $76,000 figure. Using Generally Accepted Accounting Principles ("GAAP"), no charge was necessary because Roberts' options were underwater on any possible measurement date. McAfee, however, took share prices from two different measurement dates to generate the $76,000 compensation charge. The mixing of measurement dates violated GAAP. Even with the false accounting, the restated charge for the Promotion Grant accounted for only a minuscule fraction of the total restated amount.

**M. Roberts is permitted to engage in discovery in the SEC suit; McAfee inhibits those efforts by wrongfully ceasing to advance Roberts' legal fees**

78. On September 26, 2007, the Northern District of California permitted Roberts to conduct discovery in the SEC lawsuit. Roberts promptly subpoenaed records from McAfee including, among other materials, all e-mail related to the 2000 Promotion Option, all documents related to the findings and conclusions of Project Shield, and all internal and external criticism of the Special Committee's work. McAfee, in defiance of the subpoena, continued to withhold key

information around these topics from Roberts and the government. Some information it disclosed as late as the start of Roberts' criminal trial. Other information McAfee withheld entirely and it came to light only through third parties.

79. Roberts and McAfee entered into an indemnity arrangement when he became an Executive Vice President. The indemnity agreement required McAfee to advance Roberts' legal defense fees in the event that Roberts was sued in his role as a company officer. The company began advancing the costs of his defense, but then, to inhibit Roberts' defense and continue to shield unfavorable information, McAfee wrongfully ceased advancing Roberts the cost of his defense in blatant violation of the agreement beginning in October 2007—the month Roberts subpoenaed McAfee's documents—and continued to withhold funds for another nine months. The effect was to hamper Roberts' defense when the court permitted his counsel to conduct discovery into critical issues surrounding the 2000 Promotion Grant and Project Shield.

**N. The government dismisses most of its criminal case even before trial; after more than two years of defending against false accusations, Roberts is vindicated: a jury acquits him and the government drops its remaining criminal and civil charges**

80. In or about June 2008, Roberts deposed the former McAfee board member who chaired the Audit Committee in 2002 when the BOD approved Samenuk's Merit Grant. The board member confirmed that the BOD continued discussing Samenuk's compensation after the January 15, 2002 board meeting and that the BOD did not select the meeting date as the date of the Merit Grant. He also reviewed the Compensation Committee minutes from the January 15, 2002 meeting and did not dispute the January 16, 2002 date for the Merit Grant included in the minutes. McAfee and its investigators had access to this board member throughout the investigation and were in a position to provide this information to federal investigators much

earlier. McAfee failed to do so. Shortly after the board member's deposition, on or about August 6, 2008, the DOJ dropped four of the seven counts against Roberts, including all counts relating to the 2002 Samenuk Merit Grant.

81. On or about September 16, 2008, Roberts' criminal trial commenced. On the evening of the first day of trial, the government disclosed critical documents to Roberts' defense team that it had just received from McAfee that night—after the fourth demand for such documents. These late-disclosed e-mails, which were indisputably responsive to the June 2006 SEC subpoena, the August 2006 DOJ subpoena, and Roberts' September 2007 subpoena, showed that what Roberts had said from the start was true—that Roberts had not orchestrated the change to his Promotion Grant exercise date, as the government alleged, but that Davis, working with SOS, carried out what was in fact a routine correction to an employee's options without direction from Roberts.

82. After nearly three weeks of trial, a federal jury in San Francisco rejected the government's (and McAfee's) case against Roberts. On or about October 3, 2008, it acquitted him of the remaining wire and mail fraud counts. The jury reached no verdict as to the falsifying documents charge and the district court declared a mistrial on that charge. The district judge strongly recommended against re-trying the case. On the next business day, the DOJ agreed and dismissed the remaining charges against Roberts.

83. On or about March 20, 2009, after several more months of hard-fought litigation— which led to the further unraveling of the "evidence" McAfee fed to the government—the SEC voluntarily dismissed all remaining civil charges against Roberts. Roberts was at last vindicated. McAfee's nearly three years of deliberate, underhanded efforts to scapegoat Roberts—at a

tremendous cost in government time and resources—had almost come to an end. Even after Roberts won exoneration, McAfee continued to defame him on its website.

84.     Upon information and belief, Roberts was the only McAfee officer or director prosecuted criminally or civilly in relation to McAfee's stock option practices. McAfee's manipulation of evidence through Project Shield was a substantial factor in causing Roberts' unwarranted prosecution. Roberts ultimately was vindicated and cleared of all wrongdoing. McAfee's actions substantially and irreparably damaged Roberts' career and professional reputation. Criminal and civil prosecution inflicted substantial harm on Roberts' personal life and professional reputation from which he has not recovered. As a result of McAfee's wrongful and malicious conduct, Roberts has suffered extensive economic harm in the form of lost wages and benefits, lost earning capacity, medical expenses, injury to reputation, out of pocket loss of attorneys' fees and costs, and other economic loss. As a further result of McAfee's malicious conduct, Roberts has suffered extensive non-pecuniary harm, including but not limited to, emotional distress, mental anguish, humiliation, pain and suffering, and other non-pecuniary losses.

**O.     McAfee continues in 2009 to spread false accusations of impropriety against Roberts**

85.     McAfee first falsely reported that Roberts' termination resulted from alleged impropriety relating to stock options in May 2006. More than three years later, and after Roberts' acquittal of criminal charges and the SEC's dismissal of its suit, the company continues to smear Roberts' good name. A McAfee executive sat through the entire criminal trial, hearing all of the evidence. Still, the company continues falsely to tell the world that Roberts acted improperly with respect to stock options. As of September 15, 2009, the May 30, 2006 press release remained posted on the company's publicly available website.

## V.    FIRST CAUSE OF ACTION – MALICIOUS PROSECTION:
## BAD FAITH INVOLVEMENT IN CRIMINAL PROCEEDING

86.    Roberts restates and incorporates the allegations contained in paragraphs 1 through 85 above as if fully stated herein.

87.    McAfee used Roberts as a scapegoat to divert the attention of federal authorities from its own misdeeds and the potentially criminal actions and securities law violations of Samenuk and individual board members.  Upon information and belief, McAfee instigated, encouraged, requested, facilitated, and manipulated Plaintiff's criminal prosecution by the DOJ and USAO.

88.    McAfee is liable for malicious prosecution, as it was actively involved in the events leading to Roberts' indictment and the continuation of the government's prosecution. McAfee fed information to federal authorities that it knew to be false, selectively shared information in order to paint Roberts in the most incriminating light, withheld information that a reasonable person would realize might affect the decision whether to indict or prosecute, and otherwise acted in bad faith.  Its actions were not based on reasonable grounds; rather, McAfee was motivated by a desire to deflect scrutiny from its own potential liability for securities law violations, to shield its CEO, Samenuk, and BOD members from potential liability, and/or to achieve some purpose other than seeing that justice was done.  In short, its actions were malicious and committed in bad faith.  Despite McAfee's malicious and bad faith conduct, Roberts was acquitted.

89.    Roberts' arrest, indictment and criminal prosecution resulted in his loss of liberty and caused him to endure substantial costs in defending against false charges and clearing his good name.  As a result of McAfee's malicious actions, Roberts suffered, and continues to

suffer, economic losses, including but not limited to, lost earnings and benefits (past and future), lost earnings capacity, medical costs, injury to reputation, out of pocket loss of attorneys' fees and costs, and other past and future economic losses. As a further result of McAfee's malicious conduct, Roberts suffered, and continues to suffer, injury to personal and professional reputation, mental anguish, emotional distress, humiliation, pain and suffering, and other non-pecuniary losses. McAfee's actions were a substantial factor in the harm inflicted upon Roberts, and Roberts is entitled to recover from McAfee an award of monetary damages in an amount to be determined by a jury at trial, as well as an award of pre- and post-judgment interest.

90. McAfee, through the actions of one or more officers, directors, or managing agents acting on its behalf, engaged in the conduct described above with malice, oppression, and/or fraud. Alternatively, employees or agents of McAfee, with the authorization or ratification of one or more officers, directors, or managing agents, engaged in the conduct described above with malice, oppression, and/or fraud. McAfee should be punished for the harm it caused Roberts, who seeks the maximum amount of punitive damages allowed by law.

## VI.   SECOND CAUSE OF ACTION – MALICIOUS PROSECUTION:
## WRONGFUL USE OF CIVIL PROCEEDINGS

91. Roberts restates and incorporates the allegations contained in paragraphs 1 through 90 above as if fully stated herein.

92. McAfee used Roberts as a scapegoat to divert the attention of federal authorities from its own misdeeds and the potentially criminal actions and securities law violations of Samenuk and individual board members. Upon information and belief, McAfee instigated, encouraged, requested, facilitated, and manipulated Plaintiff's civil prosecution by the SEC. In doing so, McAfee acted maliciously.

- 40 -
ORIGINAL COMPLAINT & JURY DEMAND – C - _____

93. McAfee is liable for malicious prosecution, as it was actively involved in the events leading to the SEC's lawsuit against Roberts and the continuation of those proceedings. McAfee fed information to federal authorities that it knew to be false, selectively shared information in order to paint Roberts in the most incriminating light, withheld information that a reasonable person would realize might affect the decision whether to file suit, and otherwise acted in bad faith. Its actions were not based on reasonable grounds; rather, McAfee was motivated by a desire to deflect scrutiny from its own potential liability for securities law violations, to shield its CEO, Samenuk, and BOD members from potential liability, and/or to achieve some purpose other than seeing that justice was done. In short, its actions were malicious and in bad faith. Nonetheless, despite McAfee's malicious and bad faith conduct, the government dropped all civil charges against Roberts as of March 20, 2009.

94. The government's civil allegations against Roberts caused him to endure substantial costs in defending against false charges and clearing his good name. As a result of McAfee's malicious actions, Roberts suffered, and continues to suffer, economic losses, including but not limited to, lost earnings and benefits (past and future), lost earnings capacity, medical costs, injury to reputation, out of pocket loss of attorneys' fees and costs, and other past and future economic losses. As a further result of McAfee's malicious conduct, Roberts suffered, and continues to suffer, injury to personal and professional reputation, mental anguish, emotional distress, humiliation, pain and suffering, and other non-pecuniary losses. McAfee's actions were a substantial factor in the harm inflicted upon Roberts, and Roberts is entitled to recover from McAfee an award of monetary damages in an amount to be determined by a jury at trial, as well as an award of pre- and post-judgment interest.

95. McAfee, through the actions of one or more officers, directors, or managing agents acting on its behalf, engaged in the conduct described above with malice, oppression, and/or fraud. Alternatively, employees or agents of McAfee, with the authorization or ratification of one or more officers, directors, or managing agents, engaged in the conduct described above with malice, oppression, and/or fraud. McAfee should be punished for the harm it caused Roberts, who seeks the maximum amount of punitive damages allowed by law.

## VII. THIRD CAUSE OF ACTION – DEFAMATION AND DEFAMATION *PER SE*

96. Roberts restates and incorporates the allegations contained in paragraphs 1 through 95 above as if fully stated herein.

97. McAfee's actions, as described above, in publishing written statements defamatory in nature constitute libel *per se*. McAfee willfully and/or negligently posted—and continues to post—on its website a knowingly false statement that Roberts engaged in "improper" conduct relating to stock-option grants in 2000 and that McAfee terminated his employment as a result of such malfeasance. The statement is false, highly injurious to Roberts' occupation, and tends to expose Roberts to contempt, ridicule, or shame. McAfee's harmful and false statements about Roberts' professional and business conduct are libel *per se*.

98. As a result of McAfee's malicious actions, Roberts suffered, and continues to suffer, economic losses, including but not limited to, lost wages and benefits (past and future), lost earnings capacity, medical costs, injury to reputation, out of pocket loss of attorneys fees and costs, and/or other past and future economic damages. As a further result of McAfee's malicious conduct, Roberts suffered, and continues to suffer, injury to personal and professional reputation, mental anguish, emotional distress, humiliation, pain and suffering, and other non-pecuniary losses. Roberts is therefore entitled to recover from McAfee an award of monetary damages in

- 42 -
ORIGINAL COMPLAINT & JURY DEMAND – C - _____

1   an amount to be determined by a jury at trial, as well as an award of pre- and post-judgment
2   interest.

3       99.   McAfee, through the actions of one or more officers, directors, or agents acting on
4   its behalf, defamed Roberts with malice, oppression, and/or fraud. Alternatively, employees or
5
6   agents of McAfee, with the authorization or ratification of one or more officers, directors, or
7   managing agents, engaged in the conduct described above with malice, oppression, and/or fraud.
8   McAfee should be punished for the harm it caused Roberts, who seeks the maximum amount of
9   punitive damages allowed by law.

10

11              **VIII.   FOURTH CAUSE OF ACTION – FALSE LIGHT**

12      100.   Roberts restates and incorporates the allegations contained in paragraphs 1 through
13  99 above as if fully stated herein.

14
15      101.   McAfee invaded Roberts' right to privacy in publicizing false statements that
16  portrayed Roberts in a false light. McAfee posted—and continues to post—on its website a
17  statement that Roberts engaged in "improper" conduct relating to stock-option grants in 2000
18  and that McAfee terminated his employment as a result of such malfeasance. The statement is
19  false and McAfee knew that it would create a false impression about Roberts or acted with
20
21  reckless disregard for the truth. McAfee's actions were highly injurious to Roberts' occupation,
22  and a reasonable person in Roberts' position would consider the false light created by McAfee's
23  publication to be highly offensive.

24      102.   As a result of McAfee's invasion of privacy, Roberts suffered, and continues to
25  suffer, economic losses, including but not limited to, lost wages and benefits (past and future),
26
27  lost earnings capacity, medical costs, injury to reputation, out of pocket loss of attorneys fees and
28  costs, and/or other past and future economic losses. As a further result of McAfee's actions,
- 43 -
ORIGINAL COMPLAINT & JURY DEMAND – C - _____

Roberts suffered, and continues to suffer, injury to personal and professional reputation, mental anguish, emotional distress, humiliation, pain and suffering, and other non-pecuniary losses. Roberts is therefore entitled to recover from McAfee an award of monetary damages in an amount to be determined by a jury at trial, as well as an award of pre- and post-judgment interest.

## IX.    JURY DEMAND

103.   Plaintiff demands a jury trial of all issues triable of right by a jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against defendant as follows:

1.    Actual damages;

2.    Compensatory damages;

3.    Punitive damages;

4.    Pre- and post-judgment interest in the maximum amount allowed by law;

5.    Any other relief necessary to fully compensate plaintiff for all of the detriment proximately caused by defendant, including equitable relief necessary to restore plaintiff to the position that he was in prior to defendant's unlawful conduct; and

6.    Any other relief deemed proper by the court.

Date: September 1L, 2009

Respectfully submitted,

By:   LAW OFFICE OF MARY DRYOVAGE

Mary Dryovage, Esq.
Attorney for Plaintiff